UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DANIEL HICKLIN, JR.,**<br><br>Plaintiff,<br><br>v.<br><br>**ROBERT A. MCDONALD, SECRETARY,**<br>**U.S. DEPARTMENT OF VETERANS**<br>**AFFAIRS,**<br><br>Defendant. | Case No. 1:14-cv-01569-CRC |

**MEMORANDUM OPINION**

The Department of Veterans Affairs ("VA") terminated Plaintiff Daniel Hicklin from his IT position after an internal investigation found that he had threatened his supervisor and made other aggressive and inappropriate comments in the presence of multiple co-workers. Hicklin, who is African American and Christian, sued under Title VII of the Civil Rights Act of 1964, alleging that he was fired because of racial and religious bias on the part of his supervisor, and that he had experienced a hostile work environment. Because Hicklin has failed to adduce any credible evidence to rebut the validity of the VA's stated reason for his termination, or to suggest the existence of a hostile work environment, the Court will grant summary judgment in favor of the Department.

**I.     Background**

The following facts are undisputed unless otherwise indicated. The Chief Information Officer for the VA's Office of Research & Development, Darryl McGraw, hired Mr. Hicklin as an Information Technology Specialist in May 2013 and supervised him until September 2013.

1

Def.'s Statement of Material Facts ("SMF**")** ¶¶ 1, 3–4. Both Hicklin and McGraw are African American and self-professed Christians. Id. at ¶¶ 5–7. Their relationship got off on the wrong foot when McGraw rebuked Hicklin for failing to obtain an identification badge during his first week on the job. Am. Compl. ¶¶ 6–7. Soon after, McGraw began receiving complaints about Hicklin's job performance. See Def.'s SMF ¶¶ 14–17; see also Def.'s Mem. Supp. Mot. Sum. Jud. ("MSJ"), Ex. 6 (email from a VA employee complaining that Hicklin spent hours in non-work-related conversations); Ex. 7 (email from another IT staffer reporting that Hicklin had failed to reimage an employee's computer); Ex. 8 (email from a VA employee recounting that Hicklin had told her a problem could not be fixed even though another specialist then fixed it); Ex. 9 (memo from another VA employee stating that Hicklin failed to respond to her IT request). After the first complaint, an argument ensued during which McGraw scolded Hicklin for not knowing how to locate the workstation of an employee who had requested IT assistance. Def.'s MSJ, Ex. 1 at 35:20–36:3 (McGraw Dep.). Although the parties dispute the precise nature of this confrontation, both agree that at the end of the conversation, McGraw asked Hicklin if he was threatening him to which Hicklin responded that he was not. Compare Def.'s SMF ¶ 11 with Pl.'s SMF ¶ 11.

On September 11, 2013, McGraw issued Hicklin a "Counseling Memorandum" detailing the various employee complaints McGraw had received and suggesting how Hicklin could improve his job performance. Def.'s MSJ, Ex. 5. McGraw provided Hicklin with a copy of the memorandum and met with him to review it. After that meeting, McGraw added a postscript to the memo noting that Hicklin had become aggressive during the meeting, challenging the sincerity of McGraw's religious beliefs by exclaiming "you supposed to be a minster[.]" Id. McGraw warned Hicklin that his remarks were inappropriate and that "[McGraw's] religion

2

shouldn't have anything to do with this conversation." Id. Uncomfortable with Hicklin's behavior, McGraw consulted with the VA's human resources department on potential disciplinary actions, and scheduled a second meeting with Hicklin for September 16, 2013 to formally admonish him for disrespectful conduct. See Def.'s MSJ, Exs. 12, 34.

At approximately 8:00 a.m. on the day of the scheduled meeting, a gunman opened fire at the Washington Navy Yard, injuring three people and killing twelve. Later that morning, McGraw emailed Hicklin to re-schedule their meeting because Hicklin did not want to meet without a union representative present. Def.'s MSJ, Ex. 11. McGraw testified in his deposition that Hicklin then came to his office to ask about the meeting, to which McGraw replied that he had already emailed him about it. Def.'s MSJ, Ex. 1 at 43:19–46:2. Hicklin initially walked away, McGraw recalled, but then returned to the threshold of McGraw's office and pronounced—in a voice loud enough to carry—that "pay day is coming." Id. Roddrick Sanders, an IT staff member who sat near McGraw's office, confirmed in his deposition that Hicklin said "payback is coming, or something to that effect." Def.'s MSJ, Ex. 13 at 11:18–12:6 (Sanders Dep.).

McGraw immediately reported the incident to the agency's HR department and alerted his staff to the perceived threat. Def.'s MSJ, Ex. 1 at 45:21–46:2, 65:18–66:5. When HR requested statements from other VA employees, McGraw emailed blank incident reports to employees who had spoken to him in the past about Hicklin so that they could document their experiences with him. Id. at 67:14–69:11. In the completed incident reports, employees described numerous inappropriate and aggressive statements by Hicklin, including direct threats of violence he made against McGraw. See Def.'s MSJ, Ex. 13 (report noting that "Mr. Hicklin has also stated repetedly [sic] that he's 'trained' towards violence while in the military . . . [and]

3

has the potential to snap and do irrational things . . . I sit in the cubicle in front of him and on any given day Mr. Hicklin will recount perceived incidents with Mr. McGraw to former co-workers, relatives, friends and clients within the building."); Ex. 17 (report stating that "[Hicklin] has mentioned becoming or wanting to become violent in several situations."); Ex. 19 (report describing Hicklin's comment that "he had been convicted of killing someone years and was given the choice of prison or joining the Army."); Ex. 20 (report recounting "on numerous occasions Daniel Hicklin has approached me after meeting with Darryl McGraw and has voiced physical threats against Darryl . . . [Hicklin] has also made statements that he is going to show [McGraw] that he can't talk to him any way and that he is not somebody to mess with.").

Upon learning of the reported "pay day" threat, the VA flew in two out-of-state employees to conduct a formal investigation. Def.'s SMF ¶ 48. The investigators began by confirming the statements that McGraw and other VA employees had made in their incident reports. Id. at ¶ 49. Additional interviews with coworkers who had not submitted incident reports revealed new allegations of misconduct by Hicklin. See Def.'s MSJ, Ex. 24 (statement by VA employee that "one of [her] staff reported that Mr. Hicklin had told her that he had a gun."); Ex. 25 (statement by another employee that Hicklin often bragged to her about his special ops training and that she feared Hicklin would retaliate against her if she provided a written statement to the investigators). While the investigation was pending, Horace Blackman, the IT Director for VA's Central Office and McGraw's second-line supervisor, placed Hicklin on administrative leave. Def.'s SMF ¶ 53; see also Def.'s MSJ, Ex. 26.

After speaking with Hicklin's supervisors and coworkers, the investigators compiled a summary of findings for the agency's review. Def.'s MSJ, Ex. 25. Based on those findings, the VA charged Hicklin with making threats of violence and recommended his removal, concluding

4

that Hicklin's actions had "create[d] a very high level of anxiety and disruption in the workplace." Def.'s MSJ, Ex. 31. The VA informed Hicklin that it was considering dismissing him and advised him of his rights, including the right to respond to the proposed removal. Id. The VA further notified Hicklin that the deciding official, the VA's Acting Executive Director for Field Operations, would make the ultimate decision after independently considering the evidence against Hicklin as well as his reply. See id. The Acting Executive Director—with no apparent involvement from McGraw—ultimately decided to terminate Hicklin, and he was dismissed in April 2014. See Def.'s MSJ, Exs. 32–33. Hicklin lodged a timely complaint with the VA's Equal Employment Office alleging discrimination, and, after his administrative complaint was dismissed, filed suit in this Court. Pl.'s Opp'n to Mot. to Dismiss, Ex. 1.

**II.     Standard of Review**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to demonstrate an "absence of a genuine issue of material fact" in dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The court accepts as true the nonmovant's evidence and draws all reasonable inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In ruling on a motion for summary judgment, "the court may not make credibility determinations or otherwise weigh the evidence." Johnson v. Perez, 823 F.3d 701, 705 (D.C. Cir. 2016) (citing Calhoun v. Johnson, 632 F.3d 1259, 1261 (D.C. Cir. 2011)). The nonmovant, however, cannot rely on allegations or conclusory statements alone to create a material factual dispute. Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006).

### III. Analysis

#### A. Intentional Discrimination

When, as here, a plaintiff has alleged that his termination was the result of unlawful discrimination, the burden shifts to the employer to provide a "legitimate, nondiscriminatory reason" for the termination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). Once such a reason is offered, the question becomes "whether the employee has 'produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race [or] religion[.]'" Vatel v. All. of Auto. Mfrs., 627 F.3d 1245, 1246 (D.C. Cir. 2011) (quoting Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008)). Proof of intentional discrimination includes "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." Dunaway v. Int'l Bhd. of Teamsters, 310 F.3d 758, 763 (D.C. Cir. 2002).

The Department has offered a legitimate, non-discriminatory reason for Hicklin's termination: After investigating Hicklin's purported threats against McGraw, interviewing other VA employees who had reported similarly aggressive or inappropriate behavior by Hicklin, and considering Hicklin's written response, the VA concluded that the charges were well-founded and that removal was appropriate. See Def.'s MSJ, Ex. 33. Accordingly, seven months after his reported "pay day" threat, the VA terminated Hicklin. Id.

To survive summary judgment, Hicklin must therefore produce either direct evidence of discrimination or evidence showing that the agency's stated reason for his termination is simply

6

pretextual, *i.e.* that racial or religious animus actually motivated his termination.[1]  Hicklin argues that the VA's rationale is pretextual because (1) he did not pose a safety risk and (2) McGraw orchestrated the entire incident based on his own discriminatory bias.  To the first point, the question is not whether Hicklin actually intended to do violence, but whether there was a reasonable basis for the VA to conclude that Hicklin's conduct justified his termination.  See Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers.") (internal citation and quotation marks omitted).  Nothing in the record negates the VA's honest belief and reasoned finding—based on multiple employee statements to independent investigators—that Hicklin's actions warranted dismissal.

To Hicklin's second argument, it is true that, under the so-called "cat's paw" theory of liability, a personnel action by a neutral decision maker can be discriminatory if it was improperly influenced by a third-party acting with discriminatory intent.  See Staub v. Proctor Hosp., 562 U.S. 411, 421 (2011).  But Hicklin fails to connect his termination to McGraw's alleged bias with any credible evidence in the record.  He accuses McGraw of manipulating VA employees' involvement in the investigation by preying on racial stereotypes involving African Americans and gun violence.  Not only is this counterintuitive given that McGraw is himself African American, but more importantly, Hicklin offers no proof that McGraw influenced any of the seven other employees who reported inappropriate conduct by Hicklin to VA investigators,

---

[1] Hicklin accuses McGraw—and no one else—of discrimination.  The Court's analysis will thus focus on whether evidence exists to suggest that McGraw's actions were racially or religiously motivated.

7

several of whom worked in departments outside of McGraw's control.  There is also no evidence of discriminatory comments or behavior by McGraw or any of the other employees involved in the investigation or Hicklin's termination.  "Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment." Stewart v. White, 61 F. Supp. 3d 118, 127 (D.D.C. 2014) (citing AFL–CIO v. U.S. Dep't of Transp., 564 F.3d 462, 465–66 (D.C. Cir. 2009)).[2]

Furthermore, even if McGraw were involved in the removal, the same-actor inference would foreclose Hicklin's claims of discrimination because "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire, especially when the firing has occurred only a short time after the hiring." Vatel, 627 F.3d at 1247 (quoting Waterhouse v. D.C., 298 F.3d 989, 996 (D.C. Cir. 2002)) (internal citation and quotation marks omitted).  McGraw hired Hicklin in May 2013.  Def.'s MSJ, Ex. 1 at 10:18–11:9 (McGraw Dep.).  Hicklin's first alleged threat came only three months after his hiring, and McGraw reported Hicklin's "pay day" warning less than a month later.  Even though Hicklin may be correct that McGraw was not deeply involved in the hiring process, McGraw still "made the decision to hire" Hicklin knowing that he would be working under his supervision.  The

---

[2] Hicklin does present, as evidence of McGraw's supposed racial bias, the deposition of a former VA employee who opined that McGraw was intimidated by "sharp, independent, self-sustaining, African American male[s]." Pl.'s Opp'n, Ex. 3 at 40–41. Like Hicklin's "cat's paw" theory, however, this testimony is too conclusory and lacking in factual support to withstand summary judgment.

reasoning behind the same-actor inference therefore still applies and thwarts any finding of discrimination.

Hicklin's claim that his termination was the result of religious discrimination is even less rooted in the record, which fails to show any discriminatory conduct by McGraw regarding Hicklin's religion. To the contrary, Hicklin admits that *he* was the one to raise the topic of religion by calling McGraw's actions "not Christ-like." Def.'s MSJ, Ex. 2 at 70:2–3 (Hicklin Dep.); see also Pl.'s Opp'n, Ex. 15 at 00077. Given that the only evidence of racial discrimination Hicklin cites is a conversation in which he questioned McGraw's religious beliefs (and not the other way around), no reasonable jury could infer that religious discrimination motivated Hicklin's termination.

Accordingly, the Court will grant summary judgment in favor of the Department on Hicklin's claims of intentional discrimination.

### B. Hostile Work Environment

"To prevail on a hostile work environment claim, [Hicklin] must first show that he . . . was subjected to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577 (D.C. Cir. 2013) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). He must also demonstrate that "there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." Román v. Castro, 149 F. Supp. 3d 157, 170 (D.D.C. 2016) (quoting Na'im v. Clinton, 626 F. Supp. 2d 26 63, 73 (D.D.C. 2009)). Both are lacking here.

Hicklin has failed to present enough evidence to support his hostile work environment claim. None of the alleged abuse that Hicklin attributes to McGraw in his complaint, see Am.

9

Compl. ¶¶ 15–40, were targeted at Hicklin's race or religion.  Moreover, isolated verbal clashes over work-related issues, like the ones alleged here, do not amount to a hostile working environment.  See Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008).  In addition, the Counseling Memorandum and Hicklin's placement on administrative leave followed established Department policies, were professional in tone, and were grounded in "legitimate reasons and constructive criticism"—far from the physical and verbal harassment typically associated with hostile work environment claims.  Id.  Without any showing of the "severe" or "pervasive" discriminatory conduct necessary for a hostile work environment, summary judgment is appropriate.

**IV.   Conclusion**

For the reasons set forth above, the Court will grant the VA's motion for summary judgment in its entirety.  The Court will issue an Order consistent with this Memorandum Opinion.


Date: January 24, 2017

CHRISTOPHER R. COOPER
United States District Judge